In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-2670

LOLA AJAYI,

*Plaintiff-Appellant,*

*v.*

ARAMARK BUSINESS SERVICES, INC.,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 C 4403—**Paul E. Plunkett**, *Judge.*

ARGUED FEBRUARY 19, 2003—DECIDED JUNE 26, 2003

Before FLAUM, *Chief Judge*, COFFEY and KANNE, *Circuit Judges.*

KANNE, *Circuit Judge.* Lola Ajayi, an African-American woman born January 12, 1956, brought this race-discrimination, age-discrimination, and retaliatory-discharge suit against her former employer, Aramark Business Services, Inc., under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 *et seq.* (2003), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (2003), and 42 U.S.C. § 1981. Ajayi identified as discriminatory thirteen adverse employment actions, including her eventual termination, which she also alleged was in retaliation for her having filed an EEOC charge. Aramark moved for

summary judgment. In granting Aramark's motion, the district court (1) dismissed Ajayi's ADEA claim because she did not properly raise her age claims in her EEOC charge; (2) found that most of the thirteen complained-of actions taken by Aramark did not result in a "materially adverse change" in Ajayi's employment as required to be actionable under the antidiscrimination statutes; (3) found that Ajayi could not establish that similarly situated individuals outside of the protected class were treated more favorably with respect to her remaining failure-to-promote and discriminatory-discharge claims; and (4) found that Ajayi had no direct evidence of retaliatory discharge nor evidence to suggest that Aramark's stated legitimate reasons for terminating Ajayi were pretextual. Ajayi appeals. We affirm with respect to the age- and race-discrimination claims, and reverse and remand on the retaliation claims.

## HISTORY

According to Aramark, Ajayi was an unexceptional employee who was terminated for violating company vacation policy and for dissatisfactory job performance.

Ajayi's relationship with Aramark began in March 1996, when she was hired to work as a food-service supervisor at one of Aramark's Chicago, Illinois cafeteria locations. In a performance evaluation given in 1997, Ajayi received a four on a five-point scale.

In 1998, Aramark acquired a new dining-services account with Harris Bank. The bank had three locations in the Chicago Loop in need of cafeteria services: 111 West Monroe, 311 West Monroe, and an executive dining room on the 37th floor of the 111 West Monroe Building. Greg Kaminski (white male), an Aramark general manager, interviewed Ajayi and promoted her to the front-of-the-house-supervisor position ("FOHS") at the 111 location. As

FOHS, Ajayi's duties were to supervise the cafeteria cashiers and ensure that the 111 cafeteria was ready for business. Ajayi started work at 111 on August 1, 1998, making $13.00 an hour.

While working at 111, Ajayi was twice written up for insubordination by her supervisor, Ramiro Lopez[1] (Hispanic male). On January 19, 1999, Ramiro gave Ajayi her first written warning; the second he gave her a few weeks later on February 4, 1999, citing her failure to follow instructions and for showing up late four days in a row. On her March 1999 performance evaluation, Ajayi received mediocre marks (in six out of twelve categories she received a two on the five-point scale) with her evaluator observing that Ajayi was unmotivated and had poor relations with her supervisors. Despite the written warnings and the less-than-stellar review, however, Ajayi received a fifty-cent per hour pay increase.

In July 1999, Ajayi was transferred to 311 and given the position of unit supervisor, which was essentially a lateral move for Ajayi—the new position at 311 was the equivalent of her former FOHS job. But the new position did present the potential for further advancement. Kaminski informed Ajayi at the time of the transfer that should she prove successful in her new position, she would have the opportunity to be promoted to food service director of 311. Even though she was at a new location, Ramiro remained her direct supervisor.

Aramark defined success for Ajayi in her new position at 311 largely by whether she met certain monthly targets for food costs, labor costs, and direct costs. Ajayi did not

---

[1] Because Mr. Lopez shares the same last name as another individual implicated in these events, we will, for the reader's convenience, refer to him by his first name, Ramiro, throughout the remainder of the opinion.

meet these targets and, as a result, didn't get the promotion.

Instead, Aramark decided in December 1999, that it was going to eliminate her position at 311 altogether, in order further to contain operating costs, and demote Ajayi to cashier, which would reduce her wages to $8.00 per hour. She was told of this decision on January 24, 2000, and received a memo to that effect on February 9, 2000.

As it turns out, Ajayi was not demoted and continued to work as 311's unit supervisor for several months. Then, in May 2000, the assistant vice-president of Harris Bank, Joseph Mullen (African-American male), claims he received several complaints from 311 customers about Ajayi. Because Mullen was the Harris Bank employee responsible for handling complaints with Aramark's cafeteria services, he claims he relayed these comments verbally to Kaminski. On May 2, 2000, Aramark wrote Ajayi up on account of Mullen's complaints—her third written warning. The letter informed her that she would be immediately suspended from work for three days and upon her return, she would be demoted to cashier.

Meanwhile, Ajayi had decided to take some time off from work. She had prior plans to be out of the office on May 2 for medical reasons, and the day before, she had decided to inform Aramark of her intentions to extend those out-of-office plans to include a vacation from May 3 to May 16.

Aramark's vacation policy required an employee to request and receive supervisor approval for vacations at least two weeks in advance. So, on May 1, when Ajayi approached Ramiro with a two-week vacation request on the last day she planned on being in the office before leaving, Ramiro told her that she couldn't expect to receive approval on such short notice. Nevertheless, Ajayi claims Ramiro never expressly denied her vacation re-

quest. And since in the past Aramark employees hadn't received express notice of Aramark approving their vacation requests, Ajayi assumed that Ramiro's failure expressly to deny her request meant that she was free to leave.

As far as Aramark was concerned, Ajayi assumed unwisely. First, her supervisors couldn't find her on May 2 to deliver her third written warning in person and inform her of her impending suspension and demotion. Aramark construed Ajayi's continued absence as evidence of job abandonment, and in a letter dated May 11, 2000, Kaminski informed Ajayi that if she failed to report for her new job assignment as a 111 cashier by May 17, 2000, Aramark would process her termination the following day. Sometime in the interim, Kaminski also contacted Mullen and requested that he document his complaints against Ajayi.

The situation came to a head on May 17, when Ajayi returned to work at 311. (She apparently never received Kaminski's May 11 letter requesting her to report as a cashier to 111.) Ajayi received her third written warning and was suspended.

While Ajayi served her suspension, Mullen sent Kaminski an email on May 17 in which he documented receiving several complaints about Ajayi since 1998 and requested that Kaminski take appropriate action. On May 19, 2000, Kaminski sent Ajayi a letter informing her that she had been terminated for violations of the company's vacation policy and for dissatisfactory job performance. Ajayi didn't receive the letter before she finished serving her suspension, and on May 22, Ajayi returned to work. She intended to deliver her letter of resignation to Kaminski, but he told her she had already been fired. She received the letter in the mail later that same day.

Ajayi tells a different story. She notes that she quickly became dissatisfied with the FOHS position at 111. The

cashiers she managed there did not respect her authority and would not follow her instructions. She also expected to be, but was not, trained to do cash-register readings and to count down the safe and the accounts.

Ajayi's biggest problem, however, was that she perceived Ramiro to treat his Hispanic subordinates—and one cashier in particular, Lourdes Lopez (Hispanic female, no relation)—better than he treated Ajayi. Specifically, she says Ramiro required Ajayi, but not Lourdes, to clean and make coffee, required Ajayi and her African-American coworkers, but not Lourdes and her Hispanic coworkers, to adhere strictly to Aramark's tardiness and time-clock policies, and more frequently required audits of African-American cashiers than of Hispanic cashiers.

Moreover, Ajayi claims Ramiro twice wrote her up for insubordination only because he didn't like her and instead favored her Hispanic colleagues. She also notes that Ramiro issued the written warnings only after she had complained to Kaminski about his favoritism.

Ajayi's situation worsened after the transfer to 311. She claims that Kaminski's conditioning of future promotion on her ability to meet the profitability targets was unfair given that she lacked authority to control certain factors—such as personnel and food-purchase decisions—that would influence target labor and operating costs. Nevertheless, she notes that she came closer to hitting the targets than did the former food service director for 311, John Bluck (white male). Ajayi thus believes Kaminski transferred her to 311 under the pretense of advancement while intending her to fail all along.

For Ajayi, these discriminatory suspicions were confirmed on February 9, 2000, when she received the memorandum informing her that Aramark planned to demote her to cashier and reduce her pay. On February 14, 2000, Ajayi filed a charge of discrimination with the EEOC. In

it, she claimed Aramark discriminated against her on account of her national origin by denying her training, denying her the 311-food-service-director promotion, and demoting her.[2] The EEOC dismissed Ajayi's complaint on April 26, 2000, and issued her a right-to-sue letter.

Ajayi claims that after Kaminski learned of this dismissal, sometime in the last week of April 2000, he undertook a series of retaliatory actions culminating in her termination. First, she believes Kaminski fabricated Mullen's complaints about her performance. She notes that her third written warning prepared on May 2 references the complaints, but that Mullen did not document those complaints himself until May 17. Moreover, in his memo Mullen claims he had been receiving complaints about Ajayi since 1998; Ajayi wonders why it wasn't until after she filed her EEOC charge that Mullen reported these problems to Kaminski. Conversely, if Mullen had been reporting these problems all along, why had Kaminski waited until now to take action?

Second, she claims Kaminski confronted her directly about her EEOC charge. Ajayi alleges that when she returned to work on May 17 and Kaminski asked her where she had been, she explained to him that she believed that Ramiro had approved her vacation request. According to Ajayi, Kaminski stated during the course of the conversation, "Oh you left. Is it because Miss Winters [of the EEOC] did not find anything? That's why you ran out of here?" When Ajayi did not respond, Kaminski further questioned, "Are you going to stand there and act like you didn't know that you sued me?" Immediately after this exchange, Kaminski delivered Ajayi's third warning and suspended her.

---

[2] Although stylized as a national-origin discrimination claim, the parties and the district court have all along construed the charge as a claim of race discrimination. So will we.

Third, Ajayi contends that Kaminski trumped up the vacation-policy violation as a reason for her suspension and discharge. She notes that it was not mentioned in her third written warning. And as discussed above, she believed that she had *de facto* authority to take her vacation since Ramiro never expressly denied her request.

On July 20, 2000, Ajayi sued Aramark alleging race and age discrimination and retaliatory discharge. The complaint had five counts: Count I alleged racial discrimination under Title VII; Count II alleged retaliatory discharge under Title VII; Count III alleged retaliatory discharge under § 1981; Count IV alleged age discrimination under the ADEA; and Count V alleged willful discrimination in violation of the ADEA and sought liquidated damages pursuant to 29 U.S.C. § 626(b) (2003). On May 30, 2002, the district court granted Aramark's summary-judgment motion for the reasons discussed above, and this appeal followed.

## ANALYSIS

We review a grant of summary judgment *de novo*, viewing "all of the facts and draw[ing] all reasonable inferences therefrom in favor of the nonmoving party." *Franzoni v. Hartmarx Corp.*, 300 F.3d 767, 771 (7th Cir. 2002). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Schuster v. Lucent Tech., Inc.*, 327 F.3d 569, 573 (7th Cir. 2003). A genuine issue of material fact exists "only if there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Schuster*, 327 F.3d at 573 (quoting *Wade v. Lerner New*

*York, Inc.*, 243 F.3d 319, 321 (7th Cir. 2001) (quotation omitted)).

## I.   ADEA Claim

We begin with the least fact-dependent issue on appeal, whether the district court erred in dismissing Ajayi's ADEA claim for a failure to pursue administrative remedies. In order to bring an ADEA claim in federal court, a plaintiff must first have raised it in a timely EEOC charge. *See* 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the [EEOC]."); *Vela v. Vill. of Sauk Vill.*, 218 F.3d 661, 663-64 (7th Cir. 2000).

As is the case here, the issue often isn't simply whether or not the plaintiff ever filed an EEOC charge, but rather whether the charge that was timely filed was sufficiently broad to include the claims the plaintiff later raises in court. In other words, are the claims within the "scope of the EEOC charge?" *Cheek v. W. & S. Life Ins. Co.*, 31 F.3d 497, 502 (7th Cir. 1994). To answer this question we ask "what EEOC investigation could reasonably be expected to grow from the original complaint?" *Novitsky v. Am. Consulting Eng'rs, L.L.C.*, 196 F.3d 699, 701 (7th Cir. 1999) (quotation omitted). "When an EEOC charge alleges a particular theory of discrimination, allegations of a different type of discrimination in a subsequent complaint are not reasonably related to them unless the allegations in the complaint can be reasonably inferred from the facts alleged in the charge." *Cheek*, 31 F.3d at 503.

There is nothing about Ajayi's EEOC charge that would reasonably lead one to conclude that Ajayi was a victim of age discrimination. Ajayi's charge complains about three specific instances of discrimination on ac-

count of national origin.[3] She doesn't mention age anywhere in the charge. The date-of-birth field on the charge form is left blank, the age-discrimination box is unchecked, and, in describing the charge, she doesn't specify the ages of other employees who allegedly received more favorable treatment (a defect that she fails to cure even in her briefs before this Court) nor any other facts that might have alerted the EEOC to the claim.

Although Ajayi correctly notes that we have said in an earlier time that we will not preclude claims reasonably related to those described in an EEOC charge merely because a claimant made clerical errors in filling out the form, *see Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.*, 538 F.2d 164, 168-69 (7th Cir. 1976), we do not rest our decision here on an omitted check mark. Viewing the charge as a whole, it contains no facts that would reasonably alert the EEOC, or Aramark for that matter, to the possibility of age

---

[3] In its entirety, Ajayi's description of the charge read as follows:

> I. I have been employed with the Respondent since 1996. My current Position is Unit Supervisor since June 1999. During the period July 29, 1998 to present I have been denied training and promotional opportunities. Since January 12, 1999, I have complained of internal discrimination to the Respondent and nothing has been done. In June 1999, I was promised a manager position by September 1999. I was not given the position, instead I was demoted to Head Cashier with a reduction in salary.

> II. I believe that I have been discriminated and retaliated against because of my national origin, non-Hispanic, in violation of Title VII of the Civil Rights Act of 1964, as amended, in that I was not trained, I was denied a managerial position, and ultimately demoted after I complained of discrimination, while my Hispanic co-workers have been properly trained and promoted.

(R.33 at 15.)

discrimination. In this respect, her "omissions" are more than just technical defects; they thwart the basic purpose of requiring a charge, which is to give the employer "some warning of the [complained-of] conduct" and afford "the EEOC and the employer an opportunity to settle the dispute through conference, conciliation, and persuasion." *Cheek*, 31 F.3d at 500.

Ajayi says her charge should be read as claiming age discrimination because she is in fact older than Lourdes, and her charge alleges that Aramark discriminated against Ajayi in favor of Lourdes. Ajayi's argument is meritless. The charge never even mentions Lourdes by name, let alone her age or the fact that she is supposedly younger than Ajayi; it refers only to unnamed Hispanic coworkers, who Ajayi alleged were treated more favorably on account of their national origin. If Ajayi thought she had been subject to age discrimination too, she could have, and should have, said so in her charge.

Without this basic information, there is simply no reason to think that any EEOC investigation arising from Ajayi's charge would have uncovered the alleged age bias. The district court therefore did not err in dismissing Ajayi's ADEA claim on this basis. *See Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 544 (7th Cir. 1988) (dismissing retaliation claim where charge made "no mention of retaliation or any other words to that effect").

## II.  Race-Discrimination Claims

Before we leave the subject of Ajayi's EEOC charge altogether, we must determine which of Ajayi's race-discrimination claims are properly before this Court on appeal. In her EEOC charge, Ajayi complained of only three specific instances of discrimination: (1) denial of training, (2) denial of promotion, and (3) a February 2000 demotion with a corresponding pay cut.

The district court expanded this list to include a number of events that Ajayi later complained were discriminatory in her deposition or in her summary-judgment briefings: "(4) [Aramark's] practice of auditing black cashiers more frequently than non-black cashiers; (5) [Ramiro's] inquiry about [Ajayi's] handling of a time card situation with one of the cashiers; (6) [Kaminski's] statement in a 1999 meeting that [Ajayi] and [Ramiro] were incompatible and that the company would not contest her unemployment claim if she wished to quit; (7) [Aramark's] strict enforcement of the company tardiness policy against [Ajayi] but not against Hispanic employees; (8) [Aramark's] requirement that [Ajayi] perform duties not required of [Lourdes]; (9) [Ajayi's] subordinates' failure to follow her instructions; (10) [Ramiro's] authorization of overtime for a Hispanic employee at a time when the employees were told that overtime was not allowed; (11) [Ramiro's] failure to reprimand [Lourdes] for improper conduct; . . . (12) [Ramiro's] destruction of customer comment cards that contained negative comments about [Lourdes]"; and (13) Ajayi's termination. *Ajayi v. Aramark Bus. Servs.*, *Inc.*, No. 00 C 4403, 2002 WL 1160945, at *5 (N.D. Ill. May 30, 2002).

The district court ruled that nine of these thirteen actions—(1) the denial of training, (4) the discriminatory auditing practice, (5) the time-card situation, (6) Kaminski's unemployment-claim statement, (7) Aramark's selective enforcement of the tardiness policy, (9) her subordinates' insubordination, (10) Ramiro's authorization of overtime for a Hispanic employee, and (11 & 12) Ramiro's failure to discipline Lourdes and alleged destruction of negative customer comment cards—were nonactionable because they had no tangible, negative impact on Ajayi's employment. *Id.* The district court then held that three of the remaining four actions—(2) the failure to promote, (3) the demotion, and (13) her termination—were "paradigm adverse employment actions," but held that (8) Ramiro's

requiring of Ajayi, but not Lourdes, to make coffee and clean was not; the two employees had different job titles at the time and the fact that Aramark assigned different duties and responsibilities to each did not raise an inference of adverse action. *Id.* Finally, the district court held that (3) the demotion was not an adverse employment action in this case because it was undisputed that Ajayi was never actually demoted. *Id.* at \*6. That left as actionable only (2) the failure-to-promote and (13) the termination claims.

In her opening brief before this Court, Ajayi now alleges only four actions were discriminatory: (2) the failure to promote; (3) the demotion; (7) Aramark's selective enforcement of the tardiness policy, which culminated in Ramiro's February 4, 1999 write up; and (13) her termination. Ajayi has therefore waived any argument that the district court erred in holding that the remaining actions—(1), (4), (5), (6), and (8-12)—had no "tangible, negative impact" on Ajayi's employment. *See Sere v. Bd. of Trustees of Univ. of Ill.*, 852 F.2d 285, 287 (7th Cir. 1988) ("We consistently and evenhandedly have applied the waiver doctrine when appellants have failed to raise an issue in their opening brief.") (citing cases)); *see also Jones v. Union Pac. R.R. Co.*, 302 F.3d 735, 741 (7th Cir. 2002) ("By neglecting to raise the discriminatory job assignments and retaliation claims in his opening brief . . . [appellant] waived review of these two issues.") (citing *inter alia Gabriel v. United States*, 30 F.3d 75, 78 (7th Cir. 1994), and *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 667-68 (7th Cir. 1998) ("We have stated that failure to address one of the [district court's] holdings results in a waiver of any claim of error with respect to the court's decision on that issue.")). It is not enough for Ajayi merely to refer generally to these actions in her statement of facts; if she intends to challenge this aspect of the district court's ruling, she must identify the legal issue, raise it in the argu-

ment section of her brief, and support her argument with pertinent authority. *See Kalis v. Colgate-Palmolive Co.*, 231 F.3d 1049, 1058 n.5 (7th Cir. 2000); *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 951 (7th Cir. 2000). Ajayi has failed to take issue with this aspect of the district court's ruling and thus has waived any argument that it was rendered in error.

Regarding the remaining four actions, Aramark contends that two of them—(7) the February 4, 1999 write up and (13) the termination—are beyond the scope of Ajayi's EEOC charge. The scope-of-the-charge rule prevents Ajayi from pursuing her claim that the February 4, 1999 written warning for tardiness was motivated by race. Because a Title VII claim must describe the same conduct as the plaintiff's underlying charge and because Ajayi's EEOC charge never mentions or challenges this warning, she cannot pursue that claim here. *See Cheek*, 31 F.3d at 501 ("Because an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not . . . reasonably related just because they both assert forms of sex discrimination. [There must be] a factual relationship between them . . . . [, which means] the EEOC charge and the complaint must, at minimum, describe the *same conduct* and implicate the *same individuals*."); *see also Conley v. Vill. of Bedford Park*, 215 F.3d 703, 710 (7th Cir. 2000).

Ajayi argues that she complained about Ramiro's selective treatment generally in her charge and that the February 4, 1999 write up is merely a specific example of his discriminating against Ajayi in favor of Hispanic employees, which would have been uncovered by an EEOC investigation into the other events. Reading Ajayi's charge, we find no general allegation regarding Ramiro's conduct that would have uncovered the February 4, 1999 write up as a discriminatory act. To the contrary, Ajayi referred

to three specific instances of discriminatory conduct in her charge: the denial of training, the denial of promotion, and her demotion. In this regard her case is similar to the facts we confronted in *Rush v. McDonald's Corp.*, 966 F.2d 1104 (7th Cir. 1992), in which the plaintiff's charge complained of racial discrimination in the denial of a promotion and the plaintiff's discharge only. There we held that three additional instances of racial discrimination alleged in the plaintiff's complaint—denial of benefits, harassment, and adoption of a racially discriminatory policy—were not cognizable because the plaintiff had not specifically described them in her EEOC charge. *Rush*, 966 F.2d at 1110-12. At the time she filed her charge, Ajayi was aware that Ramiro had written her up for tardiness and insubordination. By her own admission, she suspected at the time that Ramiro's actions towards her were motivated by unlawful animus. Should Ajayi have wanted also to complain about the write up as a discriminatory action, she could have, and should have, included a description of it in her charge. *See McKenzie v. Ill. Dep't of Trans.*, 92 F.3d 473, 482-83 (7th Cir. 1996) (two acts of allegedly retaliatory conduct were not cognizable when acts occurred before, but were not included in, plaintiff's EEOC charge).

We need not consider whether Ajayi's Title VII termination claim lies within the scope of her charge. The district court in its discretion allowed Ajayi constructively to amend her complaint to include a termination claim under § 1981. Although Count III of Ajayi's complaint only advanced a retaliatory-discharge claim under that statute, the district court observed that Ajayi's summary-judgment materials did not specify whether she sought to advance her termination claim under just Title VII or under both statutes. Realizing that Ajayi's Title VII termination claim would likely be barred procedurally because it would fall outside the scope of her EEOC charge

(which was filed before she was fired), the district court interpreted her summary-judgment materials as advancing the claim under § 1981 (which has no charge-filing requirement) as well and addressed the termination claim's merits. The district court would not have abused its discretion if it refused to do so, *see Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."), especially since Ajayi never argued for the amendment. But neither did the district court abuse its discretion in allowing the amendment and considering the termination claim under § 1981. Because we must address the merits of Ajayi's termination claim under § 1981,[4] we will assume *arguendo* that her Title VII claim falls within the scope of her EEOC charge.

In sum, Ajayi's opening brief limited the number of actions she alleges were motivated by racial discrimination. And one of the four remaining actions identified in her opening brief is outside the scope of her EEOC charge, which leaves only the demotion, failure-to-promote, and termination claims as viable avenues of attack on appeal. We address each in turn.

---

[4] We leave for another day the question of whether under § 1981 Ajayi can state a claim for discriminatory or retaliatory discharge. *See Gonzalez v. Ingersoll Mining Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998) (expressing doubts, in dicta, that at-will employees may sustain claims under § 1981 arising out of the termination of their employment). *But see Spriggs v. Diamond Auto Glass*, 165 F.3d 1015, 1018-19 (4th Cir. 1999) (holding that an at-will employment relationship is sufficiently contractual in nature to support § 1981 claims); *see also Skinner v. Maritz, Inc.*, 253 F.3d 337 (8th Cir. 2001); *Lauture v. IBM Corp.*, 216 F.3d 258 (2d Cir. 2000); *Perry v. Woodward*, 199 F.3d 1126 (10th Cir. 1999); *Fadeyi v. Planned Parenthood Assoc. of Lubbock, Inc.*, 160 F.3d 1048 (5th Cir. 1998).

*A. Demotion*

Because Ajayi has no direct evidence of race discrimination, she must satisfy the *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this approach, Ajayi must first establish a *prima facie* case of discrimination, which then shifts the burden of proof to Aramark to provide some legitimate, nondiscriminatory reason for the challenged employment decisions. *Id.* at 802. If Aramark does so, Ajayi retains the ultimate burden to show that the proffered reasons are pretextual. *See Schuster*, 327 F.3d at 574.

Ajayi can't establish a *prima facie* case of discrimination on her demotion claim. She needs to show that (1) she is a member of a protected class; (2) she was qualified for the job or was meeting Aramark's legitimate expectations; (3) she suffered an adverse employment action; and (4) Aramark treated similarly situated employees outside of the protected class more favorably. *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999). Although, as the district court noted, a demotion is a paradigm adverse employment action, *see Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002), Ajayi cannot establish that she suffered an adverse employment action here because she, in fact, never was demoted.

Around February 9, 2000, Aramark gave Ajayi a memorandum stating that her position was being eliminated and that she would be demoted two weeks later. But as Ajayi admits, the threatened demotion never actually happened. An unfulfilled threat, which results in no material harm, is not materially adverse. *See id.* ("[A]n employee must show that material harm has resulted from . . . the challenged actions." (quotation omitted)); *cf. Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 613 (7th Cir. 2001) (finding oral and written reprimands received by plaintiff under progressive discipline policy did not sufficiently implicate "tangible job consequences"); *Sweeney v. West*, 149

F.3d 550, 556 (7th Cir. 1998). The district court's grant of summary judgment on this claim on this basis was not erroneous.

### B.  Failure to Promote

Although Aramark didn't promote Ajayi and although that inaction is materially adverse to her employment, Ajayi still cannot establish a *prima facie* case under *McDonnell Douglas*. The claim fails because Ajayi cannot show that she was treated less favorably than employees outside her protected class who were similarly situated; that is, employees who were "directly comparable to her in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

To determine whether two employees are directly comparable, a court looks at all the relevant factors, which most often include whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision. *Id*. Above all, we are mindful that courts do not sit as super personnel departments, second-guessing an employer's facially legitimate business decisions. *See generally Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1007 (7th Cir. 2002).

In arguing that she was discriminatorily denied a promotion to food service director for 311, Ajayi says that Bluck, the former food service director for 311, was similarly situated. The comparison is faulty. The two never held the same job description. Bluck held the position of food service director at 311 from August 1998 to June 1999. Before his move to 311 in August of 1998, Bluck had been a food service director at Aramark for over ten years. During that time, Ajayi was the FOHS at 111. Ajayi never

held the food-service-director position (she'd have no fail-
ure to promote claim if she did).

Even if we were to look past the differing job descrip-
tions and entertain Ajayi's argument that the two none-
theless were subject to the same performance standards—
the target cost projections for 311—we would not find
the two employees to be directly comparable. Ajayi claims
that Bluck never met those target projections and yet
never suffered an adverse employment action as a result.
On the other hand, Ajayi's failure to meet the targets
(while at the same time success in producing better num-
bers than those Bluck had managed to produce) resulted
in the denial of her promotion to Bluck's job. The compari-
son is not apt. Bluck's ten-year experience would entitle
him to more patience and deference from Aramark than
Ajayi, who had no proven performance record in a food-
service-director position. Furthermore, Ajayi and Bluck
were "operating" 311 under different conditions. Aramark's
cafeteria at 311 had been open for less than a year when
Bluck resigned. Aramark could legitimately expect 311 to
generate smaller profits during this start-up phase. By the
time Aramark refused to promote Ajayi in October 1999,
311 had been operating at a loss for well over a year. Given
these differences, Ajayi cannot legitimately compare her-
self to Bluck.

Because Ajayi has not shown that similarly situated
individuals outside the protected class were treated more
favorably, she has failed to make out a *prima facie* case
under *McDonnell Douglas*. The district court's grant of
summary judgment on Ajayi's failure-to-promote claim
was not error.

### C. Termination

Ajayi's claim that she was terminated because of her
race fails for the same reason: she has not shown that

she was treated less favorably than similarly situated individuals outside the protected class. Here, Ajayi claims Lourdes was similarly situated. As stated above, however, the two are similarly situated only if they were directly comparable. They were not. At all relevant times they had different job titles and responsibilities: Lourdes was a cashier; Ajayi was first a FOHS at 111, where she was Lourdes supervisor, and then unit supervisor at 311. It is not surprising that Aramark would both demand and expect more from Ajayi in her supervisory role, which would explain any discrepancy—if there ever was one—between how Aramark treated Ajayi and Lourdes in handling violations of the company's tardiness or vacation policies or in responding to customer complaints. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994) (finding plaintiff supervisor unable to make *prima facie* case for sexual harassment on her demotion and transfer claims because proposed comparable was nonsupervisory employee and, therefore, not nearly identical). In short, Ajayi could legitimately expect to be held to a higher standard as an FOHS or unit supervisor than that to which Aramark held Lourdes as a cashier.

Because Ajayi has not shown that similarly situated individuals outside the protected class were treated more favorably, she has failed to make out a *prima facie* case under *McDonnell Douglas*. The district court did not err in granting summary judgment to Aramark on Ajayi's termination claim.

## III.   Retaliation

Having resolved Ajayi's arguments regarding her race-discrimination claims, we now attend to her retaliation claims advanced under Title VII and § 1981 and ask whether she has raised a genuine issue of material fact to preclude summary judgment.

To make a *prima facie* showing of retaliation under either statute, Ajayi must show that she engaged in a protected activity, that she suffered an adverse employment reaction, and that there is a casual relationship between the two. *Gonzalez*, 133 F.3d at 1035. There is no dispute that Ajayi satisfied the first element by filing her EEOC charge. We also know that Ajayi was suspended and terminated shortly thereafter; so the second element is met as well. What remains for us to determine—and what is hotly contested between the parties—is whether there was a causal relationship between the two.

Viewing the evidence in a light most favorable to her, we find that Ajayi raised an inference of causation. It is uncontested that Kaminski learned of Ajayi's filing of her charge and the EEOC's subsequent dismissal and issuance of a right-to-sue letter a matter of days before he decided to suspend Ajayi. Moreover, according to Ajayi, Kaminski specifically referenced the EEOC charge when he informed her that she had been suspended. Kaminski's comments cannot be construed as direct evidence of discrimination because, in and of themselves, they do not show that but for filing her charge Ajayi would not have been fired. But his comments and the close proximity between the time Kaminski learned about the charge and when he suspended and terminated Ajayi taken together are sufficient to raise the inference, *see McClendon v. Ind. Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir. 1997) (noting that inference of causation can arise from timing alone if the protected activity and the adverse action are separated by only a few days), and to shift the burden, under the *McDonnell Douglas* framework, to Aramark to come forward with a legitimate, nondiscriminatory reason for firing Ajayi.

Aramark advanced two reasons for why it legitimately terminated Ajayi: Mullen's customer complaints and Ajayi's

violation of the company's vacation policy. Both are legitimate, nondiscriminatory reasons. *Cf. Stringel v. Methodist Hosp.*, 89 F.3d 415, 418 (7th Cir. 1996) (insubordination is a legitimate reason for discharge).

In light of these legitimate, nondiscriminatory reasons, the burden shifts back to Ajayi to "demonstrate that the proffered explanation is merely a pretext for what was actually a discriminatory motivation." *Schuster*, 327 F.3d at 574; *see also McClendon*, 108 F.3d at 797. In other words, she needs to prove that Aramark is lying. Unless Ajayi has direct evidence that Ararmark fired her for retaliatory reasons (and she has none—she comes closest with Kaminski's comments, but as noted above they are insufficient direct evidence of retaliation), she must provide indirect evidence demonstrating that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge, or were insufficient to motivate the discharge. *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (citing *Wolf v. Buss Am. Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). We evaluate Ajayi's showing based upon the entire record: "no one piece of evidence need support a finding of [retaliation], but rather the court must take the facts as a whole." *Huff v. UARCO, Inc.*, 122 F.3d 374, 385 (7th Cir. 1997).

Ajayi has presented sufficient evidence to raise a genuine issue of triable fact regarding the true reason for her termination. First, the timing of the decision and the comments made by the decisionmaker, Kaminski, are not only sufficient to raise the inference of causation, but also provide evidentiary support for Ajayi's indirect case.

Second, Ajayi makes a number of points that call into question the credibility of Aramark's purported reliance upon Mullen's complaints as a reason for her discharge. Ajayi's third written warning, which was to be delivered to her on May 2, references Mullen's complaints as a rea-

son for her impending suspension and demotion. The warning purports to attach a memorandum from Mullen documenting those complaints. Ajayi points out that Mullen's memorandum, however, was not prepared for an additional fifteen days and was only prepared at Kaminski's request. The fact that Mullen's documentation was prepared at Kaminski's request and fifteen days after it was purportedly received (and after Kaminski's confrontation with Ajayi) casts doubt on the legitimacy of Mullen's complaints.

Even if we were to excuse the circumstances surrounding the document's creation, the substance of Mullen's memorandum raises further concerns. In it, Mullen purports to have been receiving complaints about Ajayi's performance since 1998. Mullen, in his deposition, clarified that he recalled having received at least ten complaints about Ajayi from August 1998 to May 2000. He testified that each time he received a complaint about Ajayi he would inform Kaminski about it. Although Kaminski's testimony regarding the frequency and number of Mullen's complaints about Ajayi differs (another reason for calling their veracity into question), he too admits that he would have received at least one complaint from Mullen before learning that Ajayi had filed an EEOC charge. Despite the fact that these complaints were being relayed to Kaminski directly from an executive client representative with substantial authority over Harris Bank's relationship with Aramark (the specific reason cited in the May 2 written warning for the seriousness of Aramark's response), there is no evidence that Aramark took any action towards Ajayi before Kaminski learned about her EEOC charge. Only then did Mullen's complaints justify a response from Aramark.

Third, Ajayi has pointed to similar inconsistencies in Aramark's response to violations of its vacation policy. To be clear, we do not find persuasive Ajayi's assertion

that Ramiro approved her vacation request by remaining silent. Ramiro was not silent. He told Ajayi that she needed, but could not expect, to have her two-week vacation request approved when it was submitted on the day before she planned to be out of the office. By leaving work without such approval, Ajayi ignored the only reasonable interpretation of Ramiro's statements—that her vacation request had been denied.

Nevertheless, Aramark had notice that Ajayi was in violation of the company's vacation policy when Kaminski mailed his May 11 letter informing her that she would be terminated for job abandonment *if she did not return to the office before May 17*. Ajayi, in fact, did return before Kaminski's deadline expired. Despite what Kaminski had said in his letter, she was unable to save her job even though she returned before the deadline he set. The sudden shift in Kaminski's response to Ajayi's absence following their confrontation upon her return further undermines his credibility and the legitimacy of Aramark's stated reasons.

In sum, we feel Kaminski's remarks and the suspicious timing of the events surrounding Ajayi's termination are sufficient to defeat summary judgment under the *McDonnell Douglas* framework. *Cf. Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001) ("[E]vidence of inappropriate remarks not shown to be directly related to the employment decision may not support a direct-method-of-proof case, but, in connection with other evidence, might support a case under *McDonnell Douglas*."). Viewing the facts Ajayi presents in a favorable light, we conclude that a reasonable jury could find that Aramark's stated reasons for the termination were pretextual and that Ajayi was the victim of retaliatory discharge. It will be up to the trier of fact to determine whether that was the case.

## CONCLUSION

For the reasons stated above, we AFFIRM the district court's dismissal of Ajayi's ADEA claims and grant of summary judgment with regard to Ajayi's race-discrimination claims, but REVERSE the district court's grant of summary judgment on Ajayi's retaliatory-discharge claims. This case is REMANDED to the district court for further proceedings consistent with this opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*

USCA-02-C-0072—6-26-03