**Wilson BERNALES, Plaintiff–Appellant,**

v.

**MERCY HEALTH SYSTEMS, Defendant–Appellee.**

No. 04–2694.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 2005.

Decided Feb. 7, 2005.

Russell J.A. Jones, Maxwell & Baldwin, Milwaukee, WI, for Plaintiff-Appellant.

Thomas N. Shorter, Davis & Kuelthau, Madison, WI, for Defendant–Appellee.

Before EASTERBROOK, RIPPLE, and EVANS, Circuit Judges.

**ORDER**

Dr. Wilson Bernales is a Filipino–American who completed the first year of his medical residency at Mercy Hospital in Janesville, Wisconsin. Dr. Bernales was not offered a contract to return for a second year after the hospital learned that he

had repeatedly failed the examinations necessary to receive a medical license and after it determined that he was unlikely to satisfy its requirement that he receive a license by the end of his second year of residency. Dr. Bernales filed this action under Title VII, 42 U.S.C. § 2000e *et seq.* He alleged that Mercy's refusal to renew his contract was motivated by racial and national origin discrimination. The district court granted summary judgment to Mercy. For the reasons set forth in this order, we affirm the judgment of the district court.

Dr. Bernales and five other physicians began Mercy Hospital's three-year family practice residency program in June 2002. Mercy requires all residents to obtain a state license to practice medicine by the end of their second year. Although state regulations allow a resident to practice for up to five years with a temporary permit before obtaining a license, Wis. Admin. Code § Med. 5.06, Mercy imposes a more stringent requirement because residents who are not yet licensed cannot perform certain duties and must be supervised to perform others. Mercy's licensing policy is outlined in the hospital's Resident Handbook, which Dr. Bernales admits receiving.

In order to obtain a medical license in Wisconsin, a candidate must pass three examinations (the United States Medical Licensing Examination (USMLE) Step–1, Step–2 and Step–3). Wis. Admin. Code § Med. 1.06(3)(b). Step–1 and Step–2 may be taken in any order, but a candidate must pass both before he is eligible to take Step–3. *See* http://www.usmle.org/faqs/faqusmle.htm#Do. Also, the candidate (with one irrelevant exception) must pass all three examinations within seven years. Wis. Admin. Code § Med. 1.06(3)(b). Furthermore, any candidate who fails any exam more than twice must have his application reviewed by the state Medical Ex-

amining Board, which may require such additional "professional training or education" as it deems fit before issuing a license to the candidate. *Id.* § Med. 1.08(2); *see also id.* § Med. 1.06(3)(d).

Dr. Bernales passed his Step–2 examination in September 1992. He then failed the Step–1 examination three times between 1992 and 1994 before passing it in June 1995. He also failed the Step–3 examination four times between 1997 and 1999 before passing it in December 2002. Thus, over ten years passed between the time Dr. Bernales passed his Step–2 exam and the time he passed his Step–3 exam, and seven and a half years passed between the time he passed his Step–1 exam and his Step–3 exam. Dr. Bernales informed Mercy of his Step–1 failures when he applied for the residency but did not disclose that he had repeatedly failed the Step–3 examination.

On March 13, 2003, Dr. Bernales sent the coordinator of Mercy's residency program, Kelly Potter, a copy of his passing score from the December Step–3 examination and requested reimbursement for his expenses for taking the exam. Potter had not known that Dr. Bernales had taken the exam, and his request prompted her to call the state licensing board to inquire about his USMLE examination status. Patricia Darwin of the Wisconsin Department of Regulation and Licensing told Potter that Dr. Bernales would be ineligible to receive a medical license until he again passed both the Step–1 and Step–2 examinations because his scores were so old that they violated the seven-year rule. Furthermore, Darwin told Potter that Dr. Bernales had failed the Step–3 examination four times and that his repeated failures would cause his application to be reviewed as a special case by the Medical Examining Board.

The same day she spoke with Darwin, Potter explained Dr. Bernales' licensing problems to Dr. Glenn Loomis, the supervisor of the residency program. Dr. Loomis determined that Dr. Bernales almost certainly could not obtain a license by the end of his second year of residency and might not be able to obtain one at all. Specifically, Dr. Loomis observed that Dr. Bernales would require special permission from the Medical Examining Board just to retake the USMLE series, Wis. Stat. § 448.05(6)(c), and then would have to pass at least the first two exams again (it is unclear from the record whether Dr. Bernales would have to take the Step–3 exam again since he passed it after his scores on the first two exams had expired). Even if he passed the exams, Dr. Bernales would still have to be reviewed as a special case and might be required to pursue additional training or education. Later that day, Dr. Loomis shared his concerns with Sue Ripsch, Mercy's Vice–President. Ripsch agreed that Dr. Bernales could not reasonably expect to receive a license for at least two years.

Dr. Loomis and Potter both met with Dr. Bernales later that afternoon. Dr. Loomis told Dr. Bernales that the previous hospital administration that had hired him had not been aware of the seven-year rule and, if it had, he would never have been hired because, at the time he began his residency, his Step–2 score was already more than seven years old. Dr. Loomis also criticized Dr. Bernales for not informing Mercy of his Step–3 failures. Finally, Dr. Loomis told Dr. Bernales that Mercy would not offer him a contract to return as a second-year resident but would allow him to complete the last three months of his first year. Mercy officials later provided Dr. Bernales with several favorable letters of recommendation, and he was ultimately accepted as a second-year resident into a family practice residency in Arkansas. Dr. Bernales then filed this lawsuit.

■ Dr. Bernales conceded that he had no direct evidence of discrimination. The district court therefore analyzed his claim under the burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The court found that Dr. Bernales had failed to establish his prima facie case because he did not show that similarly situated employees outside his protected class were treated more favorably. *See Ajayi v. Aramark Bus. Servs.,* 336 F.3d 520, 531 (7th Cir.2003). The district court also found that, even if Dr. Bernales had established a prima facie case, Mercy articulated legitimate, non-discriminatory reasons for its actions, and Dr. Bernales did not show that Mercy's proffered reasons were pretextual. *See id.*

Dr. Bernales argues that he met the fourth prong of the prima facie case because he identified three other first-year residents whom he claims were similarly situated: Drs. Douglass Hobson, Steve Giles and Jawaid Quddus. Drs. Hobson and Giles are white, while Dr. Quddus is from India. These three physicians were all first-year residents whose contracts were renewed even though they had not yet been licensed. A similarly situated employee, however, must be "directly comparable" to the plaintiff in "all material respects." *Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir.2002). Here, it is undisputed that none of the other three residents had Dr. Bernales' history of failing the USMLE exams and that each was making normal progress towards receiving a license during the second year of his residency. Indeed, all three physicians obtained licenses the following year. Only Dr. Bernales faced the prospect of repeating the USMLE series and also completing additional require-

ments imposed by the state board. *Cf. EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 151 (7th Cir.1996) (two unlicensed social workers not similarly situated because one was eligible to take state licensing exam while other was not). Thus Dr. Bernales failed to satisfy the fourth prong of the *McDonnell Douglas* test, and summary judgment for Mercy was appropriate.

■ Even assuming Dr. Bernales had established his prima facie case, he did not show that Mercy's reason for firing him was pretextual. In order to demonstrate pretext, Dr. Bernales must show that Mercy lied when it declined to offer him a second year based on its doubts that he could timely receive a medical license, not that it simply made an incorrect or unreasonable business decision. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1012 (7th Cir.2004). He fell well short of meeting his burden. Dr. Bernales contends, without elaboration, that he would have tried to earn a license during his second year and also asserts that one of the other three identified residents might have failed to complete the licensing requirements. But these arguments do not address Mercy's reasons in declining to renew his contract. Among the hospital's first-year residents, only Dr. Bernales violated the seven-year rule and only he would be classified as a special case by the state board. Moreover, Mercy took action within hours of learning that Dr. Bernales had concealed his repeated examination failures, further suggesting that his licensing problems were the true reason for his termination. Dr. Bernales points to nothing in the record that suggests that Mercy's decision not to renew his contract was anything other than a business decision made in good faith and based on a realistic assessment of his chances of receiving a license.

Accordingly, the judgment of the district court is affirmed.

AFFIRMED