**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 7, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

MARY BARONE,

     Plaintiff-Appellant,

v.

UNITED AIRLINES, INC.,

     Defendant-Appellee.

No. 08-1348

(D.C. No. 07-cv-01277-LTB-KMT)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, TYMKOVICH,** and **HOLMES**, Circuit Judges.

Plaintiff-Appellant Mary Barone appeals the district court's grant of

summary judgment to Defendant-Appellee United Airlines, Inc. ("United") on her

Title VII claims of gender discrimination and retaliation. The district court

concluded that Barone could not demonstrate a prima facie case under either

theory of discrimination. Exercising jurisdiction pursuant to 28 U.S.C. § 1291,

we reverse the district court's ruling and remand for further proceedings.

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

I

United employed Barone in February 1995. App. at 736. In October 2005, Todd Sprague promoted Barone to Manager of Business Administration at United's Denver station; he supervised Barone until her employment ended. Id. at 105. Sprague reported to Jim Kyte, General Manager of Customer Service. Id. at 546.

Barone has submitted a declaration stating that it was her job "to continually check and conduct investigations to correct pay and other systematic problems that were costing the company dollars[,] . . . . [and] to go into the records and develop reports," id. at 494, and she has testified that in executing these duties associated with her new position, she initiated several investigations that uncovered payroll irregularities, especially within the "ramp organization" (employees that worked with aircraft on the runway). Barone discovered that United was improperly paying male ramp organization managers shift differential. Id. at 112. Sprague told her "to look the other way," id. at 111, but when Barone completed a formal investigation and threatened to report her findings to the code of business conduct, Sprague said that "he would look into it," id. at 112. Kevin Mortimer, the Ramp Manager, eventually corrected the problem. Id. at 164.

Barone also discovered that United was improperly paying ramp servicemen "EZ Hours," that is, a full overtime hour for a few minutes that an employee worked beyond a normal shift. Id. at 112. Sprague first told her "to

stop the investigation, get rid of it, throw it away, delete it," id., but as the problem continued to surface, he told Barone to work with Carolyn Forrest on the issue, id. at 112-13.

In April 2006, United promoted Scott Hildebrand to the newly created Business Analyst position. Id. at 167. Barone never applied for this position, but when she learned that Hildebrand received a larger raise with his promotion than she did, she asked Sprague about the difference. Id. at 107-08. Sprague said that the difference was "[b]ecause he's a man." Id. at 108. Barone told him that she considered this discrimination. Id.

According to Barone, her working relationship with Sprague "spiraled out of control" after this conversation. Id. at 114. Sprague began telling her about Mortimer's impression of her investigations: specifically, Sprague told her that Mortimer thought the spreadsheets Barone was providing the ramp organization were not useful, and Sprague told her that Mortimer said she "needed to grow some kahones, that [she] need[ed] to work on the ramp to be put in [her] place because [she didn't] get it." Id. at 113-14. Sprague himself "was demeaning with his words," id. at 114, and would "talk down" to two other female employees "in front of their peers to the point where they would be crying," id. at 393-94. He told Barone "not to cooperate with world headquarters" with her EZ hours investigation, and not to provide those reports to Mortimer. Id. at 114. He also

3

criticized Barone's performance, even after she followed his directions.[1]  Id. at 115.  When Barone's responsibilities were adjusted in June 2006 to include scheduling manpower for customer service and the ramp organization, she was worried because she believed the previous manager had been forced out of that position.  She contacted Jeanne Nelli, Senior Human Resources Generalist, to verify she would be supported.  Id. at 115-16, 843.

Despite Barone's reservations, her email communications after the June 2006 adjustment of her responsibilities revealed an initial positive relationship with her superiors.  Sprague emailed Barone on June 29, 2006 that he "was so happy that [she was] a part of [his] team and appreciate[d] [her] willingness to adapt to a changing organization.  Scheduling is already a better place because of [her] leadership."  Id. at 173.  Barone replied with "[j]ust so you know I LOVE IT down here- there is so much to do."  Id.  On July 26, 2008, Kyte praised her prior work: "[n]ice job.  Have I told you lately how much I appreciate you?"  Id. at 120, 180.  On August 1, 2006, Sprague praised her leadership: "[t]ruly, performance management is one of your strong suits!  I embrace your enthusiasm

---

[1]Barone also claims that in 2000, Sprague "took [her] in a van and drove [her] around the concourse and threatened" Barone that if she "were to ever go over his head again there would be serious consequences." App. at 433-34.  Barone explained that when she was on leave Sprague's supervisor asked her to perform a "book move," and after Sprague called her house several times "yelling at [her] because [she] did it incorrectly," she called Sprague's supervisor to complain about his conduct.  Id. at 433, 442.

4

to raise the bar for our organization." Id. at 182. "Honey- you have no idea," was Barone's reply. Id.

Barone continued to report what she perceived to be instances of gender discrimination. When Barone questioned why her 2005 annual evaluation only rated her as "successful" (an overall rating of "3"), Sprague explained that anyone who was recently promoted was not capable of earning a score higher than a "3." Id. at 404. After Barone compiled the entire station's evaluation scores and learned that only men in her job group and higher job groups received scores higher than "3"–even men that recently had been promoted like Barone–she told Sprague that she considered this practice discrimination and told him that she wanted it reported to Human Resources. Id. at 404-05, 439. Barone also reported to Sprague that United was hiring young male ramp organization employees who were earning significantly more than female management employees in a higher job grade. Id. at 141. Sprague told her that United was "bringing in these men at a higher rate of pay, that it was not something that was set up in Denver." Id.

Barone's final investigation, and the thrust of her Title VII claims, concerned male management improperly receiving vacation pay. Id. at 142-43, 439. When she reported her findings to Sprague on July 21, 2006, Sprague notified Kyte, and emailed Mortimer:

> Kevin,
> I don't appreciate your comments to Mary! She is responsible for payroll for the station. She is getting

5

direction from me. The ORD excellence team is expecting us to have the entire station in MARS now. We need to clean this stuff up before outsiders come in and question our inconsistencies. We need to be consistent as a station. We don't allow this for front line employees after several discussions with labor relations. This could put us in a difficult position if the union were to find out this was happening.

As far as Mary is concerned, she is trying to help...and fix things. If you don't think you need it, then I'll take the drug test with you.

Id. at 142-43, 611 (ellipses in original). Mortimer testified that he determined the ramp organization was only compensating employees for accrued vacation days, and he informed Barone about these results. Id. at 489. Barone claims that he responded to "the one employee that [she] pointed out." Id. at 433. Nonetheless, Barone continued preparing a final report up until her employment ended.

Barone's employment ended on August 17, 2006. During that final month of employment, Sprague met with Barone several times. Although the timing of these meetings is unclear, and the parties dispute the substance of several meetings, the record reflects that the following interactions occurred.

On Thursday, August 3, Sprague criticized Barone for poorly handling a union investigation. Barone had previously discovered an unusually high percentage of employees who neglected to either "punch in" at the beginning of a shift, or "punch out" at the end, but who nevertheless claimed that they worked the entire shift. Id. at 117-18. Sprague wanted Barone to implement a process

6

with the union that would resolve the problem, id., but in that meeting he criticized her for handling the investigation improperly and for not following procedure or protocol, id. at 127.  In an email that afternoon, Barone questioned whether Sprague had discussed "[t]he union's perception of me or your perception of me?  I AM NOT HAPPY."  Id. at 193.  Barone was absent from work on Friday, id. at 127, and when she received Sprague's reply email and similarly worded text message–"Mary, you need to come talk with me.  I am a Mary Barone fan and it appears that you don't think so," id. at 128, 193–Barone wrote a two-page email and sent it to Sprague's personal account.[2]  Id. at 128.  In the email Barone detailed what she believed to be "[f]alse accusations by my boss," id. at 189-90.  She described how it "[l]ooks like . . . I have a choice here, one would think with this track record of never doing anything right, they are not the right person for the job," told Sprague that he was "the only one who made [her] average," and ended with "I am sick to my stomach– I can only work when I know I am of value– I know now that I am not.  You will never be able to change my mind.  THE PICTURE IS VERY CLEAR!"  Id.

Sprague met with Barone the following Monday to discuss this email.  Id. at 130.  Shortly thereafter, Sprague met with Barone and Nelli to discuss the email again.  Id.  Barone testified that she explained to Sprague that her email

---

[2]Barone testified that she sent the email to Sprague, but she did not intend for him to receive it at his home account.  App. at 128.

"was a reaction from [Sprague] telling [her] that [she was] not doing anything right, that [she could not] do anything right, that [she was] providing reports that [were not] beneficial. And then [Sprague] tells [her], in writing, that he's a fan. [She] was confused. [She] didn't understand." Id. at 129. She testified that she never told Sprague she sent him the email because she wanted to "make him mad." Id. at 129, 131.

Sprague also had three discussions with Barone about her mid-year evaluation. Barone testified that when Sprague first discussed the evaluation with her over the telephone he told her that she was "not effective, that [she did not] do good work, that [she was] basically a clerk, [and] that [she did not] follow directions." Id. at 124. When they discussed the evaluation in person Sprague repeated this criticism, told her that she "work[ed] too hard; [she] even work[ed] on the weekends," and told her that Mortimer thought that she did not "get it, that [she] needed a dose of reality; and that's why they want[ed] to put [her] on the ramp. He even said that Jim Kyte felt that way . . . ." Id. at 125.

The third mid-year evaluation discussion occurred on August 14, 2006. Id. at 724. Barone and Sprague met with Jeanne Nelli. In stark contrast to the previous two discussions, Barone testified that she received "a very complimentary evaluation in front of Jeanne Nelli." Id. at 129. Sprague testified that he described her performance as "successful," but he also noted that Barone needed to improve "her ability to accept feedback and learn from that as a

8

manager." Id. at 724. Sprague testified that the conversation then shifted to Barone's August 4 email, and when Barone "stated that she was trying to make [Sprague] mad with that email," Nelli questioned why Barone would "deliberately do something to make [her] manager mad." Id. According to Sprague's testimony, Barone then began expressing her "frustrations with her work environment under" Sprague, during which she said that she was "not a 3" and that if she was a "3," she could not work for Sprague. Id. Barone does not remember these conversations, but she testified that she remembered "saying [she] was not of value." Id. at 129.

At some point during her last week of employment, Barone remembers telling Sprague about the findings on the vacation pay discrimination report that she was finishing.[3] Also, at some point in August, Barone remembers that Sprague "put it in [her] head to leave United." Id. at 136. Barone telephoned Sprague on August 15, 2006 to tell him that she wanted to remain with United, and to demonstrate how she was "trying to improve on all the feedback [Mortimer] was giving [her]," Barone requested that Mortimer write her year-end

---

[3] It is hard to determine the precise date when Barone made this report. Although Barone testified that she made her final complaint of vacation pay discrimination to Sprague three days before her employment ended, App. at 434, she later testified her final oral complaint occurred during "the last week that [she] was working at United," id. at 435. Additionally, Barone clarified that after she made the July 21, 2006 report of discrimination to Sprague, she "believe[d] that [she] continued to talk about this particular situation into August, because [she] never got to finish the investigation." Id. at 437.

9

evaluation.  Id.  Sprague complimented her, but was unwilling to grant this request.  Id.

Despite this conciliation, Barone's employment essentially ended two days later on August 17, 2006.  According to Barone, Sprague held a "very short" meeting that day:

> [H]e requested that I come and meet him in his office.  When I got there, [Senior Human Resources Generalist] Jeanne Nelli was there.
> And he said to me that he had thought long and hard about his decision, and it was the hardest decision he ever had to make.  He said: Here are your two choices: You can either move to Orange County as a part-time customer service agent, or you can resign from the company.

Id. at 130-31.  In response to this ultimatum, Barone told Sprague that she could not move to California because of her three children, and she asked Sprague why he was making her choose between these options.  Sprague "said it was because he could not get over the fact that [she] wanted to make him mad."  Id. at 131.  Barone did not understand what Sprague meant, and asked to speak privately with Nelli.[4]  Id.  Before leaving, Sprague "slid a blank piece of paper [Barone's] way and said to write out [her] resignation."  Id.  She wrote her resignation, but tore it up when Sprague left the room.  When Barone asked Nelli for help, the Senior

---

[4] Barone also remembers that she asked if the ultimatum had "anything to do with Kevin Mortimer," and Sprague said that it did not.  Id. at 131.  Barone also asked if the ultimatum had anything to do with the behavior that Mortimer and Sprague exhibited toward Barone.  Id.  She remembers that Sprague only acknowledged that Sprague had previously used foul language.  Id.

Human Resources Generalist repeated that Barone could either resign from the company or go to Orange County, id. at 424, and further confirmed that "[t]here's nothing I can do; they contacted me first, and the station made up their mind," id. at 132. Barone again wrote her resignation letter, and received two weeks of administrative leave compensation. Id. at 728.

Sprague offered a different version of that meeting. He testified that "Mary was a person that [he] trusted and believed was capable of continuing as a leader at United Airlines; albeit, she made some mistakes." Sprague Depo. 36; Aple.'s Br. Ex. 10. His thought process going into that meeting was the following:

> If she accepts accountability for feedback and accepts the fact that I, as her manager, am going to give her constructive feedback and takes ownership of the fact and apologizes for what I felt was an inappropriate email . . ., I was willing to let her continue her employment. I was going to wait and see what the tone of the discussion was.
> If she was adamant that she was not going to accept accountability, I was prepared to discharge her. And that's why I had pre-established that she had rights back to Orange County.
> . . .
> [I]f the conversation did not result in her taking accountability for her actions and apologizing for some of her actions, that I would fire her.
> And it did not go that way. . . . [S]he said: Maybe I should resign. And my words were: At this point, I would accept that.

Id. at 36-38. Sprague testified that employees that resign or are removed from management have the right to resume their last union position with the company.

11

App. at 726. He also testified that prior to the meeting, he did not consider demoting Barone to a leadership position because if "she wasn't going to take accountability for her actions as a leader, [he] did not want her to continue in a leadership position . . . ." Id. at 727. At that time, he did not consider demoting her to a non-leadership position in Denver. Id. Sprague also testified that he believed Barone improperly accessed her mid-year evaluation. Mid-year evaluations contain a confidential score that superiors do not disclose to subordinates, and Sprague believed that Barone accessed her evaluation "and found out she was going to be rated a 3 before [he] ever had an opportunity to discuss it with her." Id. at 729.

Certain aspects of Sprague's testimony contradict the version of events he told Jim Kyte. For example, although Sprague testified that he consulted Kyte about possibly terminating Barone, id. at 727, Kyte testified that Sprague never consulted him about removing Barone from management, and he also testified that he had no information about whether Barone was involuntarily removed from management, id. at 547. Additionally, although Sprague testified that his actions during the August 17, 2006 meeting were not based on his suspicion that Barone improperly accessed her mid-year evaluation, id. at 730, Kyte, in contrast, testified that Sprague told him that Barone resigned because she was unhappy with her evaluation and because she "had a breach of trust by accessing her evaluation prior to it being released to her." Id. at 547.

12

Following Barone's resignation, Sprague, Nelli, Kyte, and another United employee all decided that in the event Barone reapplied, she would not receive a management position. Id. at 733, 843. Sprague testified that while he did not believe that Barone "was fit for a leadership position in Denver," he also did not believe she was fit for a non-leadership salaried position in Denver because it would not "be a good thing for somebody who wasn't taking accountability for their actions to be demoted and continue working with the same people that she was just managing . . . ." Id. at 728. He never considered placing her in a non-leadership position in Denver that did not require her to interact with previous co-workers. Id. Barone requested reinstatement after she resigned, and United denied the request. Id. at 136. United temporarily filled her position with a male employee until it selected a permanent female replacement. Id. at 579.

Mortimer testified that Sprague never spoke to him about removing Barone from management, and Mortimer learned of Barone's resignation from an interoffice note. Id. at 490. Mortimer also testified that he complained to Sprague about some of Barone's reports because he was frustrated with "her style of discovering perceived deficiencies . . . and how she handled that . . . . [S]he would gather information and then give it to [him] with the expectation that [he] would fix it." Id. at 882. Mortimer was "looking for support administratively." Id. Barone, however, believed that Mortimer played a role in ending her employment with United. She testified that Sprague told her many times that "he

13

was doing something because Kevin [Mortimer] asked him to . . . . Sprague told [her] of things that Kevin [Mortimer] said for treatment for [her] . . . . [T]here were things that [] Sprague made decisions on that Kevin told him to do." Id. at 429. Barone also claims that Mortimer was "demeaning and disrespectful" toward women, id. at 434, that he made sexually derogatory comments about women, id. at 534, and that Mortimer often inappropriately commented on her appearance and made a vulgar sexual remark to her in the spring of 2006, id. at 534, 840.

Barone brought suit against United in the District Court of Colorado. She invoked federal question jurisdiction to assert claims of age discrimination and retaliation in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA"), and claims of gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"). She invoked supplemental jurisdiction to assert a discrimination claim pursuant to Colorado's Anti-Discrimination Act, Colo. Rev. Stat. §§ 24-34-401 to -406 ("CADA"), and state law claims for breach of contract and estoppel. Barone agreed to dismiss her ADEA claims, App. at 36, 48, 99, and United moved for summary judgment on all other claims. The district court granted United summary judgment on the Title VII claims, declined to exercise supplemental jurisdiction over state law claims and dismissed them without prejudice, and dismissed the ADEA claims without prejudice pursuant to Federal

14

Rule of Civil Procedure 41.  <u>Barone v. United Air Lines, Inc.</u>, No. 07-cv-01277, 2008 WL 4372674, at \*9 (D. Colo. Sept. 19, 2008).

After Barone filed her notice of appeal in this case, she reasserted her state law claims against United in Colorado state court.  United invoked diversity jurisdiction to remove that action,[5] and then moved for summary judgment.  The district court, relying on our Title VII precedent, denied summary judgment on the CADA claim, concluding that genuine issues of material fact existed as to the constructive discharge issue.  <u>Barone v. United Air Lines, Inc.</u>, No. 08-cv-02487, 2009 WL 2710150 at \*1 & n.3 (D. Colo. Aug. 26, 2009).

## II

Before reviewing the merits of this appeal, we first address United's concern that we lack appellate jurisdiction.  United contends that the district court's disposition of Barone's first action was not a final decision under 28 U.S.C. § 1291 because the district court dismissed Barone's ADEA claims without prejudice pursuant to Federal Rule of Civil Procedure 41, and dismissed her supplemental state law claims without prejudice pursuant to 28 U.S.C. § 1367(c).  We disagree; neither dismissal without prejudice prevents us from exercising appellate jurisdiction.

We have jurisdiction over "appeals from all final decisions of the district

---

[5] United is incorporated in Delaware and maintains its principal place of business in Illinois.  Barone is a citizen of Colorado.

15

courts of the United States . . . ." 28 U.S.C. § 1291.  "Although a dismissal without prejudice is usually not a final decision, where the dismissal finally disposes of the case so that it is not subject to further proceedings in federal court, the dismissal is final and appealable."  Amazon, Inc. v. Dirt Camp, Inc., 273 F.3d 1271, 1275 (10th Cir. 2001).  "The critical determination as to whether an order is final is whether plaintiff has been effectively excluded from federal court under the present circumstances."  Id. (quoting Facteau v. Sullivan, 843 F.2d 1318, 1319 (10th Cir. 1988)) (alteration omitted).

United claims that Barone has not been effectively excluded from federal court because diversity jurisdiction existed over Barone's state law claims and "[a]s a result, [those] state law claims are, once again, pending in federal district court, albeit in a new case before a different judge."  Aple.'s Br. at 25.  But the possibility that diversity jurisdiction existed over Barone's state law claims does not mean that the district court's disposition was not a final appealable decision.  In Amazon, the plaintiff's complaint asserted federal and state law claims against multiple defendants, and claimed that both supplemental and diversity jurisdiction existed over the state law claims.  273 F.3d at 1273.  The parties disagreed whether one defendant's citizenship destroyed complete diversity.  When the district court granted the defendants summary judgment on the federal claims, it then declined to exercise supplemental jurisdiction over the state law claims, dismissing them without prejudice.  Id. at 1274.  One of the prevailing defendants

16

appealed, arguing that because diversity jurisdiction existed, the district court should have addressed the merits of the state law claims.  Id.  While the appeal was pending, the plaintiff then filed its state law claims in state court against the defendant that had appealed, and that defendant removed that case to federal court.  Id. at 1274 n.3.

Despite the possibility that complete diversity existed, we held that the district court's disposition was a final decision because the "district court dismissed the entire action, effectively excluding Amazon's suit from federal court."  Id. at 1275.  United attempts to distinguish Amazon by arguing that appellate jurisdiction in that case depended on the "hotly disputed" issue of diversity of citizenship, whereas in this case diversity is undisputed.  This is an immaterial distinction: we placed no emphasis on the underlying citizenship dispute when we concluded that we had appellate jurisdiction in Amazon.  Only after concluding that we had appellate jurisdiction did we then turn to the prevailing defendant's appeal regarding the existence of diversity jurisdiction.  Id. at 1276.

Additionally, the voluntary dismissal of Barone's ADEA claims does not divest this court of appellate jurisdiction.  It is true that "when a plaintiff voluntarily requests dismissal of her remaining claims without prejudice in order to appeal from an order that dismisses another claim with prejudice, we conclude that the order is not 'final' for purposes of § 1291."  Cook v. Rocky Mtn. Bank

17

Note Co., 974 F.2d 147, 148 (10th Cir. 1992); see also Heimann v. Snead, 133 F.3d 767, 769 (10th Cir. 1998).  But Barone agreed to abandon her ADEA claims before the district court ruled on United's summary judgment motion.  Moreover, it is important to note that the voluntary dismissal of Barone's ADEA claims is essentially with prejudice because the statute of limitations prevents her from refiling them.[6]  Thus, the voluntary dismissal of Barone's ADEA claims, though without prejudice, effectively excluded those claims from federal court.  See Jackson v. Volvo Trucks N. Am., Inc., 462 F.3d 1234, 1238 (10th Cir. 2008) (holding that the dismissal of a state civil conspiracy claim without prejudice to refiling was a final decision because the underlying tort claims were dismissed with prejudice).

III

"We review a district court's grant of summary judgment de novo, applying

---

[6] Under the ADEA, a complainant has ninety days to bring suit after receiving notice of the EEOC's final determination.  29 U.S.C. § 626(e).  Barone alleged that she filed suit within this period, App. at 17, but her Rule 41 voluntary dismissal did not toll this limitations period because, "as a general rule, a voluntary dismissal without prejudice leaves the parties as though the action had never been brought," Brown v. Hartshorne Pub. Sch. Dist., 926 F.2d 959, 961 (10th Cir. 1991) (holding that a voluntary dismissal under Rule 41(a)(1) did not toll Title VII's limitations period, which requires claimants to bring suit ninety days after receiving a right-to-sue letter from the EEOC), abrogated on other grounds as stated in Keeler v. Cereal Food Processors, 250 F. App'x 857, 860-61 (10th Cir. 2007); see also Garfield v. J.C. Nichols Real Estate, 57 F.3d 662, 664, 666-67 (8th Cir. 1995) (holding that § 626(e) barred an age discrimination suit when the original action was filed within the ninety day period, but after the parties agreed to a dismissal without prejudice, the plaintiffs again filed suit seven months later).

the same standards as the district court." Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1112 (10th Cir. 2007). Summary judgment is only appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). In resolving this question, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in h[er] favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," id., our role in this procedural posture is "simply to determine whether the evidence proffered by [the] plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain her claim," Jones v. Barnhart, 349 F.3d 1260, 1265-66 (10th Cir. 2003) (quotations and citations omitted).

The district court granted United summary judgment because it concluded that under either theory of employment discrimination Barone could not establish that her employer subjected her to a cognizable adverse action. It thus ended its inquiry at the prima facie stage of the familiar burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), without considering the remaining stages. We conclude Barone has presented sufficient evidence to establish a prima facie case of gender discrimination and retaliation. We also reject United's invitation to affirm the district court's judgment on alternative

19

grounds not addressed by the district court, i.e. that United's proffered reasons for the constructive discharge were not pretextual. Accordingly, we reverse the district court's grant of summary judgment and remand this case to the district court for further proceedings.

A

Barone relied on circumstantial evidence to prove her claims of employment discrimination in the district court; accordingly, we analyze her claims of gender discrimination and retaliation under the burden-shifting framework that the Supreme Court established in McDonnell Douglas. Plotke v. White, 405 F.3d 1092, 1099 (10th Cir. 2005) (gender discrimination); Stover v. Martinez, 382 F.3d 1064, 1070-71 (10th Cir. 2004) (retaliation). Under this framework, the plaintiff has the burden of establishing a prima facie case of prohibited employment action by a preponderance of the evidence. Plotke, 405 F.3d at 1099. Once the employee demonstrates a prima facie case, the burden of production shifts to the employer to articulate "some nondiscriminatory reason for its behavior." Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004). Once the employer satisfies this burden of production, in order to prevail the employee must show the employer's reasons are pretextual. Id.

We emphasize that the burden of establishing a prima facie case is "not onerous." See Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981); see also Wiley v. Glassman, 511 F.3d 151, 155-56 (D.C. Cir. 2007) ("In either

20

situation [discrimination or retaliation], as the Supreme Court has made clear, the burden of establishing a prima face case is not onerous." (quotations and alterations omitted)); Orr v. City of Albuquerque, 417 F.3d 1144, 1149 (10th Cir. 2005) (describing the burden of establishing a prima facie case as "slight"). The McDonnell Douglas framework, "intended progressively to sharpen the inquiry into the elusive factual question of intentional discrimination," Burdine, 450 U.S. at 255 n.8, functions as an analytical tool that "serves to bring the litigants and the court expeditiously and fairly to th[e] ultimate question" of whether the employee was the victim of intentional gender discrimination, or whether the employer's adverse actions were motivated by a retaliatory intent, id. at 253; see Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 153 (2000); Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir. 2006). As such, we have described the prima facie showing as "relatively lax." Annett v. Univ. of Kan., 371 F.3d 1233, 1241 (10th Cir. 2004).

Bearing these descriptions of plaintiff's burden in mind, we now turn to the individual prima facie showings required for Barone's claims of disparate treatment and retaliation.

1

Barone claims that United's actions on August 17, 2006 constituted unlawful gender discrimination. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to h[er] compensation,

21

terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Although the precise articulation of the prima facie case "depend[s] on the context of the claim and the nature of the adverse employment action alleged," Plotke, 405 F.3d at 1099, a prima facie case of disparate treatment has three essential elements: Barone must show that (1) she "belongs to a protected class;" (2) she "suffered an adverse employment action;" and (3) "the challenged action took place under circumstances giving rise to an inference of discrimination." E.E.O.C. v. PVNF, Inc., 487 F.3d 790, 800 (10th Cir. 2007). Within the "sensible, orderly way [that McDonnell-Douglas] evaluate[s] the evidence in light of common experience," Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978), the analytical function of the prima facie case is to "eliminate[] the most common nondiscriminatory reasons for the plaintiff's" challenged adverse action, Burdine, 450 U.S. at 254. Establishing a prima facie case narrows the "inquiry into the elusive factual question of intentional discrimination" by "in effect creat[ing] a presumption that the employer unlawfully discriminated against the employee," which thereby compels the employer to respond with a nondiscriminatory explanation for its decision. Burdine, 450 U.S. at 254, 255 n.8.

We broadly construe what qualifies as an adverse employment action in light of Title VII's remedial nature. Orr, 417 F.3d at 1150. An adverse employment action occurs under circumstances that "constitute[] a significant

22

change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Stinnett v. Safeway, Inc., 337 F.3d 1213, 1217 (10th Cir. 2003) (quotations and citations omitted). We employ a "case-by-case approach, examining the unique factors relevant to the situation at hand." Id. (quotations and citations omitted).

Thus, the operative question with respect to Barone's gender discrimination claim is whether the limited options United presented to Barone during the August 17, 2006 meeting "constitute[d] a significant change in employment status." Id. (quotations and citations omitted). Despite Barone's allegations that she was removed from management, demoted, transferred, and reduced to part-time status, the district court concluded that she could not prove that any such adverse employment action occurred, especially because she subsequently resigned as a full-time management employee. We disagree with this analysis because it fails to view the evidence in the light most favorable to Barone, and it fails to assess the immediate impact United's ultimatum had upon Barone's employment.

In the light most favorable to Barone, United presented her with two definite and clear options on August 17, 2006: she could "either move to Orange County as a part-time customer service agent, or [she could] resign from the company." App. 130-31. We conclude that forcing a management employee with

23

a successful performance record to "choose" between resigning and relocating across several states to continue her employment in a part-time and non-management capacity effectively changed Barone's employment status. United compelled Barone to choose between two undesirable options. Whichever option Barone chose, it would significantly, and immediately, alter her "compensation, terms, conditions, [and] privileges of employment." 42 U.S.C. § 2000e-2(a)(1). Because a reasonable jury could find that these consequences amounted to an adverse employment action, we reverse the district court's grant of summary judgment on her gender discrimination claim. See Nance v. Maxwell Fed. Credit Union, 186 F.3d 1338, 1340-41 (11th Cir. 1999) (concluding that the choice between a demotion with a salary reduction or a resignation with severance pay was an adverse employment action under the ADEA because either option "constituted a change in respect to [the employee's] terms of employment").

United characterizes these options as "threats [that] never materialized and thus were unfulfilled at the time [Barone] quit." Aple.'s Br. at 37. As such, United contends a third option existed: Barone could have "refused either to resign or to accept a demotion, and continued to work in the Manager Position until Sprague took–as opposed to threatened to take–an adverse employment action against her either by discharging her or demoting her." Id. We reject this argument because it ignores our standard of review. In viewing the August 17, 2006 meeting under the summary judgment standard, we look at only those

24

options that United actually presented to Barone. According to Barone's testimony, Sprague gave her only two alternatives, without contingencies, and without any opportunity for Barone to avoid these options by somehow improving her performance, or even by continuing in her present employment. Sprague stressed the urgency of Barone's response to this ultimatum by "slid[ing] a piece of paper [her] way and [telling her] to write out [her] resignation" after Barone insisted she could not move to Southern California. App. at 131. And Senior Human Resources Generalist Jeanne Nelli confirmed that Sprague's decision was United's decision by repeating these options after Sprague left and emphasizing that she could offer Barone no help: "There's nothing I can do; they contacted me first, and the station made up their mind." Id. at 132. Thus, in the light most favorable to Barone, it is clear that Barone's demotion and transfer to Southern California was not a mere threat but a final decision of her employer, to take effect immediately should Barone refuse to resign.[7]

_____

[7] United relies on Seventh Circuit precedent for the proposition that "[a]n unfulfilled threat, which results in no material harm, is not materially adverse," Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 531 (7th Cir. 2003), but the facts of that case are presently distinguishable. In Ajayi, an employer gave its employee "a memorandum stating that her position was being eliminated and that she would be demoted two weeks later." Id. That demotion never materialized, and when the employee later filed suit, the Seventh Circuit concluded that she could not establish a prima case of discriminatory demotion because "she, in fact, never was demoted." Id.

As just discussed, the factual circumstances in this case, viewed in the light most favorable to Barone, stand in stark contrast to the facts of Ajayi. Barone's employment consequences had fully materialized as a result of the August 17

(continued...)

United does not dispute the remaining elements of Barone's prima facie case of disparate treatment on appeal, and we conclude that she has presented sufficient evidence for a reasonable jury to conclude that she belonged to a protected class and that the circumstances of her adverse employment action give rise to an inference of discrimination. Generally the most common nondiscriminatory reasons for an adverse employment action, such as a termination, demotion, or failure to hire, are a plaintiff's lack of qualification or the elimination of the position at issue. Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1166-67 (10th Cir. 1998); see also Jones v. Denver Post Corp., 203 F.3d 748, 753 (10th Cir. 2000) (requiring the plaintiff to prove, in a prima facie case of discriminatory demotion, that he was "qualified for the position at issue" and that "the job from which he was demoted was not eliminated"). Here, Barone has presented sufficient evidence to dispel both explanations because United rated her as successful three days before her employment ended and United temporarily filled her position with a male until selecting a permanent female replacement. This evidence, combined with her testimony concerning Sprague's and Mortimer's demeaning and derogatory behavior toward her and other female employees, sufficiently establishes the necessary "logical connection between each element of the prima facie case and the inference of discrimination." Plotke,

---

[7](...continued)
ultimatum: if Barone did not resign, she would be immediately demoted and transferred.

26

405 F.3d at 1100. Accordingly, we conclude Barone has "made the *de minimus* showing required for a prima facie case of gender discrimination." Id. at 1102.

2

Barone also claims that United unlawfully retaliated against her for the discriminatory payroll practices that she was uncovering. "Title VII's antiretaliation provision forbids employer actions that 'discriminate against' an employee (or job applicant) because he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or hearing.'" Burlington N.& Santa Fe Ry. Co. v. White, 548 U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, Barone must show "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse–that is, that the action might 'dissuade[] a reasonable worker from making or supporting a charge of discrimination,' and (3) that a causal connection exists between the protected activity and the materially adverse action." PVNF, 487 F.3d at 803 (10th Cir. 2007) (quoting White, 548 U.S. at 68).

In White, the Supreme Court determined that Title VII's substantive provision, which governs claims of disparate treatment, was not "coterminous" with its antiretaliation provision. White, 548 U.S. at 67. Concluding that "[t]he scope of the antiretaliation provision extends beyond workplace-related or

27

employment-related retaliatory acts and harm," the Court adopted a different standard to describe "the level of seriousness to which [retaliatory] harm must rise before it becomes actionable." Id. "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotations and citations omitted). The standard is objective, but it is phrased in "general terms because the significance of any given act of retaliation will often depend upon the particular circumstances." Id. at 69. "Context matters" in analyzing this question; for example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children." Id.

Thus, the operative question with respect to Barone's retaliation claim is whether a "reasonable employee in [Barone's] shoes would have found the defendant's conduct sufficiently adverse that he or she well might have been dissuaded by such conduct from making or supporting a charge of discrimination." Williams v. W.D. Sports, N.M., Inc., 497 F.3d 1079, 1090 (10th Cir. 2007). The adverse employment action analysis set forth above applies here with equal force, but given that material adversity is a broader standard, we expand our view to consider more thoroughly the "'constellation of surrounding circumstances, expectations, and relationships'" that culminated in the August 17,

28

2006 consequences.  White, 548 U.S. at 69 (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 82 (1998)).  In the light most favorable to Barone, she encountered considerable friction in carrying out her job responsibilities, which entailed "continually check[ing] and conduct[ing] investigations to correct pay and other systematic problems that were costing the company dollars[,] . . . . [and] go[ing] into the records and develop[ing] reports." App. at 494.  According to Barone's testimony, Sprague initially rebuffed her findings on improper shift differential, Sprague prohibited her from working with World Headquarters on her "EZ Hours" investigation, and as Barone became more vocal about her investigations which unearthed discriminatory practices, Sprague became more vocal about Mortimer's perceptions of her investigations as useless and unhelpful, as well as Mortimer's suggestion that Barone should be demoted to the ramp to experience reality.  Given this opposition to her investigations, and given that Barone informed Sprague about the vacation pay discrimination report she was finishing during the final week of her employment, a reasonable employee in Barone's shoes could well conclude that the August 17, 2006 ultimatum was more than mere discouragement of her investigations, but was instead an effort to silence the investigator herself.  Because a reasonable jury could conclude that a reasonable employee in such circumstances might well have been dissuaded from making or supporting a charge of discrimination, we reverse the district court's grant of summary judgment on her retaliation claim.

29

As with Barone's gender discrimination claim, United does not dispute the remaining elements of Barone's prima facie case of retaliation on appeal, and we conclude that she has presented sufficient evidence for a reasonable jury to conclude that she satisfied the remaining two elements. "Protected opposition can range from filing formal charges to voicing informal complaints to superiors," Hertz v. Luzenac Am., Inc., 370 F.3d 1014, 1015 (10th Cir. 2004), and Barone's oral reports to Sprague about the discriminatory payroll practices she was discovering certainly fall within this definition. Finally, Barone first reported her findings of vacation pay discrimination on July 21, 2006, less than one month before her employment ended, and she again informed Sprague about her findings during her final week of employment. The close temporal proximity between her challenged action (United's August 17 ultimatum) and her last instances of opposition activity (her reports of discrimination) is itself sufficient to infer a causal connection. See PVNF, 487 F.3d at 804 (concluding that a temporal proximity of less than one month is sufficient to establish a causal connection). Accordingly, we conclude that Barone has presented sufficient evidence to establish a prima facie case of retaliation.

3

In granting United summary judgment on Barone's Title VII claims of disparate treatment and retaliation, the district court ultimately framed the limited options that United presented to Barone during the August 17, 2006 meeting as a

case of constructive discharge, and concluded that Barone's evidence did not meet this substantial showing. Although we have already concluded that Barone can establish a prima facie case of disparate treatment and retaliation, we also conclude that Barone has presented sufficient evidence to establish a prima facie case of constructive discharge.

As previously outlined, for each claim Barone has raised she must establish as a part of her prima facie showing that her employer subjected her to a cognizable adverse action. In the district court, Barone also attempted to establish that the limited options United presented her during the August 17, 2006 meeting constituted a constructive discharge. As regards the prima facie showing for either disparate treatment or retaliation, constructive discharge is a cognizable employment action. Fischer v. Forestwood Co., Inc., 525 F.3d 972, 979 (10th Cir. 2008). To establish a constructive discharge, Barone must meet the substantial burden of showing that her employer's "illegal discriminatory acts ha[ve] made working conditions so difficult that a reasonable person in [her] position would feel compelled to resign." PVNF, 487 F.3d at 805 (quotations and citations omitted). This is an objective standard: "the employer's subjective intent and the employee's subjective views on the situation are irrelevant." Strickland v. United Parcel Serv., Inc., 555 F.3d 1224, 1228 (10th Cir. 2009). "We evaluate the voluntariness of an employee's resignation under an objective, totality of the circumstances standard." Fischer, 525 F.3d at 980.

31

In determining whether the factual circumstances presented also amount to a constructive discharge, the question in this case becomes whether Barone's working conditions became so intolerable after the August 17, 2006 meeting that a reasonable person in her position would feel compelled to resign. In concluding that her working conditions did not meet this standard, the district court emphasized how Barone's own testimony described her options as a "choice," how her request for reinstatement was inconsistent with her claim of intolerable working conditions, and how Sprague's and Mortimer's offensive behavior did not meet this standard. We disagree with this analysis because it improperly considered Barone's subjective views, which we have held are irrelevant to the constructive discharge inquiry, see PVNF, 487 F.3d at 806 n.10 ("This [objective] standard cuts both ways–just as an employee's subjective feelings that her working conditions were intolerable is not controlling . . ., neither is an employee's desire to continue working despite conditions so intolerable any reasonable employee would have long since quit."), and it failed to assess how the options United presented Barone impacted her working conditions.

Again, viewing the August 17, 2006 meeting in the light most favorable to Barone, United presented Barone with two definite and clear options: "move to Orange County as a part-time customer service agent, or . . . resign from the company." App. 130-31. In light of the totality of circumstances, we conclude that the "choice" between resignation and a compound removal from

32

management, demotion to part-time status, and transfer to a distant state was effectively no choice at all. Given the drastic employment and personal consequences Barone would have to endure were she to continue her employment with United, a reasonable jury could conclude that Barone's working conditions became so difficult as a result of the August 17, 2006 meeting that a reasonable person in her position would feel compelled to resign.

We cannot accept United's argument that these options were mere threats, and that Barone should have essentially called United's bluff by declining either option, and remaining in her management position until United took more decisive action. The factual circumstances in this case significantly differ from those we faced in Exum, where a director with the United States Olympic Committee ("USOC") resigned shortly after his supervisor, in response to the director's refusal to obey an order, called the director "insubordinate, repeated his order, and stated that [the director] could leave the USOC sooner rather than later." Exum, 389 F.3d at 1132-33 (internal quotations omitted). There, we decided that the plaintiff was not constructively discharged because "[i]nstead of resigning, [the director] could have chosen to comply with his superior's order or, alternatively, refused to comply and faced the *possible* consequences of that choice." Id. at 1136 (emphasis added). Further foreclosing his contention that he was constructively discharged was his decision to remain obstinate even though the USOC "suggested alternatives to resignation" and offered to investigate his

33

allegations that the USOC encouraged doping and was hostile toward racial minorities.  Id. at 1133, 1136.

Here, in stark contrast to the director in Exum, Barone faced more than the mere *possibility* of employment consequences.  Barone's supervisor and a senior human resources officer made it completely apparent that should she not immediately resign from her position, she faced a definite and immediate demotion and transfer.  In further contrast, United was unwilling to compromise post-resignation: Sprague testified that he would not place her in either a management or non-management position in Denver that required her to interact with prior co-workers, and he did not consider her for any other non-management positions in Denver.

### B.

Notwithstanding our conclusion that Barone can establish a prima facie case of disparate treatment and retaliation, United urges us to affirm the district court's grant of summary judgment on the alternative ground that it has offered legitimate non-discriminatory reasons for its employment action that Barone cannot prove are pretextual.  Aple.'s Br. at 40-41.  We agree that as an appellate court "[w]e may affirm the grant of summary judgment for reasons other than those used by the district court as long as they are adequately supported by the record."  Aramburu v. Boeing Co., 112 F.3d 1398, 1402-03 (10th Cir. 1997).  We decline this invitation, however, because the district court never reached the issue

34

of pretext, and given the somewhat conflicting evidence in the record, it will likely prove to be a highly fact intensive inquiry.

## IV.

For the reasons stated, we REVERSE the district court's grant of summary judgment to United and REMAND this case for further proceedings.


Entered for the Court


Mary Beck Briscoe
Circuit Judge